313 So.2d 570

**Joe RAYBON, alias**

v.

**STATE.**

**3 Div. 339.**

Court of Criminal Appeals of Alabama.

May 27, 1975.

Sam W. Taylor, Montgomery, for appellant.

William J. Baxley, Atty. Gen. and James S. Ward, Asst. Atty. Gen., for the State, appellee.

TYSON, Judge.

The indictment charged the appellant with the robbery of Mandy Jackson by taking $85.00 from her person. The Jury found the appellant guilty as charged, and fixed punishment at ten years imprisonment. The trial court entered judgment accordingly, and subsequently overruled appellant's motion for new trial.

Ben Jackson testified that, on November 18, 1972, he cashed a check for his mother for $115.00, kept $30.00 to pay her utility bills, and left her four twenties and one five dollar bill. He testified that his mother was elderly, being in her eighties, and lived alone at 917 Goode Street, Montgomery. He testified this occurred on a Saturday morning.

Mandy Jackson testified that she was eighty-seven years old, and that on the afternoon of November 18, 1972, the appellant came to her home, where she was then living, at 622 Cleveland Court, about 3:00 in the afternoon. She testified the appellant walked in, and told her, "I'm a healer." From the record:

"Q. All right, What did he do when he walked in?

"A. I'm talking on the phone—I don't know to who. He put his hand over my eyes.

"Q. Who put his hand over your eyes?

"A. That man younder [sic]. (Indicating)

"Q. All right.

"A. He put his hand over my eyes. He said, 'I'm a healer.'

"Q. He said what?

"A. 'I'm a healer.'

"Q. A healer. And then what did he say?

"A. He said, 'I'm a healer.' And said, 'Don't talk out, next door to me, don't talk loud. You had better not talk loud.' He said, 'Talk low.' And I said, 'Thank you, Jesus.' And he said, 'Thank you, Jesus.'

"Q. He said what? (Exclaiming)

"A. He said—don't holler at me now.

"Q. Well, I'm sorry, I apologize.

"A. All right.

"Q. Now, what did he say?

"A. He said, 'Talk low,' and said, 'Don't want nobody to hear,' and said, 'God sent me here and this woman what was here didn't know nothing about it— she sent me here. You just got your check.'—And my boy had just went and cashed it—and when he said this, he said, 'Talk low.' I said—he made me nervous; I don't know what had me. I said, 'Thank you, Jesus.' And he said, 'Now,' he said—he took his hand from over my eyes, and he went down.

"Q. Was he in front of you or in back of you?

"A. He was in front of me.

"Q. In front of you. Could you see his face clearly?

"A. Well, I see him when he come in there, and he was in there a good while with me.

"Q. And what did he then do to you?

"A. This is what he done: he took his hand off of here, and he went and opened the kitchen door, the back door, wooden door—didn't open the screen—and he looked out. He went in the rest-room and looked in there, and then he come back and went in my bedroom and said, 'Get that money.'

"Q. Did he find anything on you?

"A. Yes, sir.

"Q. All right. What did he do?

"A. Wait a minute, now. I keeps a belt, because when I used to deliver babies, I had a man that grabbed my pocketbook—this same pocketbook. And I don't tote no more money in no pocketbook; I got a belt—you see this? (Indicating) And I had this pocketbook here; you see here?

"Q. um hum.

"A. And he said, 'Here is a pocketbook down here,' and said, 'Get it out.' I said, 'It's not but a dollar and thirty-five cents.'—That was one paper dollar, a quarter and a dime.—And he said, 'Get that and let me see it.' I run my hand down in here and got it out, and he said, 'Put it back.' He says, 'Now, where is that other money.' And I said, 'I ain't got no other money.' And he said, 'You had better not talk loud; that man there,' he said, 'You had better not talk loud.' And said, 'You had better not talk loud.' And said, 'Go get it.'

"Well, I was thinking about the womens tied up, and behind them, the hands, the mouth, old folks like me. I went and got it.

"Q. Well, let me ask you: Before you did that, did he reach for anything, or do anything?

"A. He was putting his hands behind me; I don't know what—

"MR. KIRK: Your Honor, I believe Mr. District Attorney is doing a good job of leading this lady.

"THE COURT: I'm going to allow him to do that on account of this lady's disability and on account of her age.

"THE WITNESS: He put his hand behind me, and I didn't know what he had, and I gave him $85.00."

Mandy Jackson then identified a pocketbook in which the $85.00 had been placed, a small coin purse, and some string. She further testified that the appellant had false teeth, that later she saw him at a lineup at police headquarters, that she recognized him immediately, and that he was "shaking like a leaf." She made an independent incourt identification of the appellant.

On cross-examination, Mrs. Jackson testified that she wore glasses, and that her eyesight was not what it once was.

Mattie Jackson testified that, on the early afternoon of November 18, 1972, the appellant came to her home, at 3027 Roundtree Street in Montgomery. She testified that the appellant walked in and spoke to her mother, who was also there, and said, "What denomination is your mother," to which she replied, "She is Methodist." The appellant then stated, "I am a Baptist, shake my hand, I am colored." She testified that the appellant was white, that he then left her house, and walked across the street toward the home of Mandy Jackson. She said that the appellant told her he was a "praying man," and that two days later, on Monday, November 20, she identified the appellant at the lineup at police headquarters.

Elizabeth Johnson, the mother of Mattie Jackson, testified that she was at her home in Montgomery on the early afternoon of November 18, 1972, when the appellant pushed open the door and walked in, then stated that he wanted to pray for her. She said that he asked her for a Bible, that at this time her daughter, Mattie Jackson,

walked into the room, that the appellant spoke to her, said, "I am a Baptist," and turned and walked out of the house toward the home of her neighbor, Mrs. Mandy Jackson. She testified that she subsequently identified the appellant at a lineup at police headquarters, and made an independent incourt identification of the appellant.

The appellant's motion to exclude the State's evidence was overruled. The appellant, Joe Raybon, testified that he had been living in Montgomery since 1940, that he had at one time worked in the Sanitary Department for the City, and also for a construction company. He testified that he was fifty-one years of age and did not own a pistol. He testified that he had had two prior convictions for forgery in 1970. He testified that on November 18, 1972, he was carried by the police to the home of an elderly black woman, one Mandy Jackson, where, for the first time, he saw an elderly black woman who was nervous and upset, and that she was not wearing her glasses. He testified that he had never seen Mattie Jackson, or Mrs. Johnson, before. He testified that on three successive evenings, following November 18, 1972, he was taken to police headquarters, put in a lineup, and subsequently returned to his home. He testified that on the afternoon of November 18, 1972, he had gone by a laundry and dry cleaners shortly after lunch, and then had gone to a pool hall, on Commerce Street, where he played pool until approximately 5:00 that afternoon. He testified that he had not been to the home of Mrs. Mandy Jackson, that he had been working on a construction job that week, and had been paid, for working part-time, $32.00. He testified that he had used part of this money to pay rent and laundry.

The State then called Montgomery Police Officer George W. Sheridan as a rebuttal witness. Officer Sheridan testified that he first saw the appellant on the afternoon of November 18, 1972, sitting in a vehicle on Wilkerson Street. He testified that the appellant answered the description that had been broadcast over the police radio, that he pulled him over, and this was about 3:30 in the afternoon. He further testified that he gave him a citation for driving a vehicle while his license was under revocation. The officer further stated that the appellant was driving on Stephens Street, and told the officer that he had driven a friend from the Greyhound Bus Station to that location. He stated that Stephens Street is six to eight blocks south of the home where Mrs. Mandy Jackson lived. He also told the officer that he had driven another party to Mill Street, which is about a block from the home of Mandy Jackson. He further testified that that evening he went with some other officers when they took the appellant to Mandy Jackson's home about 11:30 that evening, and that as soon as they walked into the front door, Mandy Jackson immediately identified the appellant. Officer Sheridan also stated that the appellant wore false teeth.

I

■ Mr. Justice Harwood, then Harwood, P. J., of the former Court of Appeals, in Tunstill v. State, 33 Ala.App. 460, 34 So.2d 857, cert. denied 250 Ala. 421, 34 So.2d 859, observed:

"... Thomas v. State, 91 Ala. 34, 9 So. 81, 82, contains an excellent discussion by Justice McClellan of the offense of robbery. Therein he defines robbery to be 'a felonious taking of goods from the person of another, or in his presence, against his will, by violence, or putting him in fear. And this violence must precede or accompany the stealing.' In Hardis v. State, 28 Ala.App. 524, 189 So. 216, 217, in discussing the offense of robbery Judge Samford wrote: 'As defined by our decisions, robbery is an offense against both person and property, and is briefly defined as the felonious taking of money or goods of value from the person of another, or in his presence, by violence or by putting him in fear.

Parks v. State, 21 Ala.App. 177, 106 So. 218.'"

We are of the opinion that the State here presented a prima facie case of robbery, which, when tested by the appellant's motion to exclude, was properly submitted to the trial jury. Lambert v. State, 48 Ala.App. 600, 266 So.2d 812; Moore v. State, 48 Ala.App. 719, 267 So.2d 509; Clay v. State, 52 Ala.App. 272, 291 So.2d 364.

## II

 A conflict in the testimony between the appellant's alibi and that of the State presented a question for the jury. McColston v. State, 20 Ala.App. 591, 104 So. 347; Williams v. State, 48 Ala.App. 737, 267 So.2d 526; Zimmerman v. State, 49 Ala.App. 442, 272 So.2d 914, and cases cited therein.

The trial court properly overruled the appellant's motions.

We have carefully examined this record and find no error therein. The judgment of the trial court is due to be and the same is hereby

Affirmed.

All the Judges concur.

CATES, P. J., files opinion.

CATES, Presiding Judge (concurring):

Under Starr v. Starr, 293 Ala. 204, 301 So.2d 78, I consider that Louis v. State, 24 Ala.App. 120, 130 So. 904, and Thompson v. State, 24 Ala.App. 300, 134 So. 679, do not apply. The victim's testimony that she was scared—as set out in the State's brief[1] —was sufficient to make the case one for the jury to have chosen between robbery and the lesser charge of grand larceny.

To say the least the prosecution sagged in extracting an articulateness from Mrs. Jackson. Under Code 1940, T. 15, § 389 it twinges my conscience to stamp this thieving scoundrel as a robber.

However, I do not consider this a case of a mere scintilla.

---

1. "'Q. When he put his hand behind you, what did he do?
   A. I got scareder and scareder. It looked like my nerves went.
   Q. And what did he tell you to do when he put his hand behind you?
   A. Go get it.
   Q. Go get what?
   A. That money.
   Q. All right.
   A. I said, "Don't hurt me." I had a gun in there, but I knowed if I went and picked up my pistol, he would have taken it from me and killed me. . . .'"